LUCAS ET AL. *v.* TOWNSEND ET AL.

No. A–898.　Decided May 30, 1988

JUSTICE KENNEDY, Circuit Justice.

This is an application to enjoin a bond referendum election scheduled for May 31, 1988, in Bibb County, Georgia. The applicants are five black citizens registered to vote in Bibb County. On May 27, 1988, a three-judge District Court for the Middle District of Georgia declined to issue an injunction, concluding that the applicants had failed to establish that holding the election now contemplated would violate § 5 of the Voting Rights Act, 79 Stat. 439, as amended, 42 U. S. C. § 1973c. The United States has submitted, and I have reviewed, a memorandum advising me that it supports the applicants' request for immediate injunctive relief. I have also reviewed and considered a submission by the respondents in opposition.

I

On December 17, 1987, the Bibb County Board of Education resolved to place a bond referendum on the March 8, 1988, ballot, a primary election date popularly known as "Super Tuesday." The bond issue was intended to help defray the cost of air conditioning certain local schools. The Board subsequently voted, on January 4, 1988, to rescind its prior resolution. It resolved to postpone the referendum until May 31, 1988, when it would be voted on with a second bond issue for the building of a new high school.

On March 7, 1988, counsel for the applicants requested the Board to rescind its vote calling for the May 31 referendum. In his letter to the Board, counsel argued that changing the date of the election from a primary day would adversely affect minority voter turnout. The letter also argued that the two bond issues had been combined in an effort to manipulate the minority vote, and noted that the call for the May 31 referendum had not yet been submitted for preclearance to the Voting Section of the Civil Rights Division of the United States Department of Justice.

On March 30, 1988, the state authorities applied to the Voting Section of the Civil Rights Division for preclearance. On May 25, 1988, the Civil Rights Division responded that "the information sent is insufficient to enable us to determine that the proposed change does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," and asked for additional information, including a "detailed explanation of the reason for choosing May 31, 1988, as the bond election date."

The Civil Rights Division also requested that state authorities respond to allegations (i) that the Super Tuesday date had been abandoned because the turnout of black voters was expected to be high on that date, and (ii) that the two bond issues were consolidated to prevent black voters from voting separately on each of the proposed projects. Finally, the Division noted that the Attorney General has 60 days to consider a completed submission, and that the period would begin to run upon receipt by the Division of all necessary information.

The applicants sought an injunction prohibiting the Board from holding the election on the ground that the election had not been precleared by the Attorney General in accordance with §5. On May 27, 1988, the three-judge court denied the request for an injunction. The court stated that it was required to determine whether the actions proposed "'have the potential for diluting the value of the Negro vote and are within the definitional terms of §5.'" Civ. Action No. 88–166–1 (MD Ga., May 27, 1988) (slip op., at 3), quoting *Georgia* v. *United States*, 411 U. S. 526, 534 (1973). It also adverted to the Attorney General's regulation providing that any discretionary setting of the date for a special election, which is defined to include a referendum, is subject to the preclearance requirement, 28 CFR §51.17 (1987), and acknowledged that the Attorney General had not precleared the referendum.

The court concluded that the applicants had failed to present evidence that the procedures to be utilized in the upcoming election differ from those in use at the time the Act became law. Accordingly, it concluded that the referendum was not a "change" covered by § 5. While the court noted that the Attorney General's regulation provides otherwise, it held that the regulation is not supported by the language of § 5. Alternatively, the court concluded that the applicants had failed to show that holding the referendum on May 31, 1988, "has even the potential for diluting the minority vote." Civ. Action No. 88–166–1, *supra*, slip op., at 4–5. Accordingly, the court declined to issue the injunction prayed for by the applicants. This application followed.

## II

The principles that control a Circuit Justice's consideration of in-chambers applications for equitable relief are well settled. As a threshold consideration, it must be established that four Members of the Court will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction. See *White* v. *Florida*, 458 U. S. 1301, 1302 (1982) (Powell, J., in chambers); *Rostker* v. *Goldberg*, 448 U. S. 1306, 1308 (1980) (BRENNAN, J., in chambers). I must also be persuaded that there is a fair prospect that five Justices will conclude that the case was erroneously decided below. See, *e. g.*, *Graves* v. *Barnes*, 405 U. S. 1201, 1203 (1972) (Powell, J., in chambers). Finally, an applicant must demonstrate that irreparable harm will likely result from the denial of equitable relief. In appropriate cases, a Circuit Justice will balance the equities to determine whether the injury asserted by the applicant outweighs the harm to other parties or to the public. See *Rostker* v. *Goldberg, supra*, at 1308; *Times-Picayune Publishing Corp.* v. *Schulingkamp*, 419 U. S. 1301, 1304 (1974) (Powell. J., in chambers).

The substantiality of the federal questions presented by the case cannot be doubted. Section 5 provides that certain

jurisdictions, including the one in which this case arose, may not implement any election practices different from those in force on November 1, 1964, without first obtaining approval from the United States District Court for the District of Columbia or, alternatively, from the Attorney General. Neither statutory requirement has been met in this case. The three-judge court concluded, however, that the discretionary setting of the date of a special election is not a "change" covered by the statute, notwithstanding the provision in 28 CFR § 51.17 (1987) to the contrary. The conclusion is most problematic under our precedents, see, *e. g.*, *NAACP* v. *Hampton County Election Comm'n*, 470 U. S. 166, 178 (1985) (noting that it could not seriously be disputed that "a change in the date of an election, if effected by statute, requires approval by the Attorney General under § 5"), and I have concluded that four Members of the Court would likely vote to note probable jurisdiction and that there is a fair prospect that the Court would vote to reverse the judgment below.

I am further persuaded that irreparable harm likely would flow from a denial of injunctive relief. Permitting the election to go forward would place the burdens of inertia and litigation delay on those whom the statute was intended to protect, despite their obvious diligence in seeking an adjudication of their rights prior to the election. Even if the election is subsequently invalidated, the effect on both the applicants and respondents likely would be most disruptive. Further, although an injunction would doubtless place certain burdens on the respondents, such burdens can fairly be ascribed to the respondents' own failure to seek preclearance sufficiently in advance of the date chosen for the election. On balance, I conclude that the equities favor the applicants. Today I have entered an order enjoining the election, pending the timely docketing of an appeal.