**David LUCAS, et al., Plaintiffs,**

v.

**Judy TOWNSEND, et al., Defendants.**

**Civ. A. No. 88–166–1–MAC(WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Jan. 23, 1992.

---

Neil T. Bradley, Laughlin McDonald, Kathleen Wilde, ACLU, Atlanta, Ga., for plaintiffs.

Wallace Warren Plowden, Jr., Edward Scott Sell, Jr., Macon, Ga., Frank Cater Jones, Charles K. McKnight, Jr., Atlanta, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

By the narrow margin of 21,915 to 21,287, the voters[1] of Bibb County, in the general election of November 8, 1988, approved the issuance of twenty-nine million dollars ($29,000,000) of school bonds to pay for (1) air conditioning the remainder of Bibb County schools; (2) building a fifth high school to serve a projected 53% black–47% white student body and a new middle school; and (3) creating a magnet high school program at Northeast High School.

Dissatisfied with the decision of Bibb County's publicly elected Board of Education (the "Board") to ask the Bibb County Board of Commissioners to submit the entire bond issue to the voters as one issue instead of as three separate bond issues, the plaintiffs filed their complaint in this court alleging violations of Section Five of the Voting Rights Act (42 U.S.C. § 1973c), Section Two of the Voting Rights Act (42 U.S.C. § 1973), and the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States. Plaintiffs' claims based upon Section Five of the Voting Rights Act having been rejected by a three-judge court, *Lucas v.*

---

1. According to Plaintiffs' Exhibit 4, a total of 49,355 voters came to the polls and voted in that election. Of those, only 43,202 voted on the school bonds. Six thousand one hundred fifty-three (6,153) voters, therefore, did not vote on the school bonds.

*Townsend,* 732 F.Supp. 1581 (M.D.Ga. 1989), and that decision having been summarily affirmed by the Supreme Court of the United States, *Lucas v. Townsend,* 493 U.S. 1052, 110 S.Ct. 858, 107 L.Ed.2d 943 (1990), and plaintiffs' claims based upon Section Two of the Voting Rights Act having been decided adversely to them by this court, *Lucas v. Townsend,* 714 F.Supp. 525 (M.D.Ga.1989), their sole remaining claim to be decided by this court is that defendants have violated rights secured to them by the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States. An additional evidentiary hearing having been held on October 15 and 16, 1991, and all submitted by the parties then and thereafter having been carefully considered, this constitutes the court's findings required by Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

(1) The publicly elected Bibb County Board of Education, as early as September of 1986, began discussing the need to air condition the seventeen or more school buildings not then air conditioned; the possible need for a fifth high school and additional middle school; and the dissatisfaction of many with Northeast High School's program. That discussion continued for more than a year at committee and Board meetings, was highly publicized, and provoked pro and con discussion in the community.

(2) In 1987, preceding the December 17, 1987, school Board meeting at which a request for a school bond referendum was first acted upon, the Bibb County Board of Commissioners had already voted to hold a special election combined with the March 8, 1988, Super Tuesday presidential primary for Bibb County voters to approve or disapprove of an additional one percent (1%) sales tax to pay for county construction projects. The county commissioners, according to their commissioner representative on the Board, Mr. Zimmerman, felt that only their additional one percent (1%) sales tax should be on the Super Tuesday ballot.

(3) In spite of the expressed feelings of the county commissioners that nothing else be added to the Super Tuesday ballot and in spite of the fact that Board members were not given the required written advance notice that the matter would be considered as an action item, a resolution asking the county commissioners to call a referendum on Super Tuesday for a $6.5 million dollar bond issue to pay for air conditioning all school buildings not air conditioned, was passed by a 5–3 vote at the Board's regular December 17, 1987, meeting. One member was absent—President Judy Townsend. The minutes of that meeting state:

SUPPORT SERVICES COMMITTEE
Chairman Smith deferred to committee member Massey. He, first, noted the routine monthly reports. Next, referred to the Proposed Bond Issue, and information items discussed in committee meeting with the consensus being to delay it one year in order to better increase the chance of air conditioning all the schools in the future. Mr. Zimmerman cited the advantages for holding the bond issue referendum in 1989 with it being the only item voted on at that time and he promised full support from the Board of County Commissioners. Mr. Brown disagreed that the $6.5 million bond issue would effect the one percent tax increase negatively but could 'probably enhance the possibility of the one percent tax because there are coalitions that are already in place that have real problems with the bond issue as with the fifth high school that would probably shift to going ahead with the air conditioning, as well as consolidating with some other folks who want to do the one percent, as a way of compromising on the other issue.'
Dr. Williams invited any desired direction by the Board of which Mr. Brown responded with a motion to petition the county commissioners to place the bond issue for air conditioning on the upcoming ballot on March 8, 1988. Seconded by Rev. Smith. In further discussion, various questions and concerns were addressed including past successes on bond issues for education, the fact that a large

segment of the community is in favor of a fifth high school and air conditioning, any alternate plan for air conditioning in the event the bond issue fails, and the time frame of 2 to 3 years to air condition all schools, if the bond issue is approved based on present manpower.

Mr. Massey requested a roll call vote.

| Mr. Massey—yes | Mr. Zimmerman—no |
|---|---|
| Mr. Lane—no | Mr. Hadaway—no |
| Dr. Adams—yes | Mr. Robinson— |
| Mr. Brown—yes | Dr. Williams—yes |
| Rev. Smith—yes | |

Motion approved 5–3.

(4) The proponents of the December 17th resolution selected Super Tuesday as the requested election date because it was the next already scheduled election and they wanted air conditioning voted on as soon as possible. The opponents of the resolution were in favor of air conditioning but thought it should be submitted to the voters as part of a bond issue large enough to also pay for a fifth high school and additional middle school. Neither the proponents nor the opponents of the resolution even mentioned the possibility of an increased voter turnout caused by the particular candidates on the Super Tuesday ballot; neither gave any consideration to the possibility that the particular Super Tuesday candidates might inspire more than normal numbers of white or black voters to participate in that election; and, neither gave any consideration to whether or not having a bond election in conjunction with the Super Tuesday presidential primary election would possibly help or hurt the passage of school bonds for air conditioning.

(5) Informed by fellow Board members of the school bond resolution voted on without notice at the December 17th meeting which she had been unable to attend, President Judy Townsend talked with several Board members and Superintendent Hagler to learn what happened at the meeting. Having done so, President Townsend called a special Board meeting for January 4th. The minutes of the January 4, 1988, meeting state:

"The Board of Public Education and Orphanage for Bibb County met in a called session on Monday, January 4, 1988, at 6:00 P.M. in the Board Room at 2064 Vineville Avenue.

"Board Members present: President Judy Townsend, presiding; Doris Adams, Robert Brown, Don Hadaway, William Lane, Stephen Massey, Melvyn Williams and Earl Zimmerman. Thomas E. Hagler, Superintendent, was also present.

"The meeting was called to order by President Townsend. She advised the purpose of the meeting as being to discuss and act on (1) the capital outlay project to complete air conditioning of all schools and build a new high school and middle school in northwest Bibb County and (2) financing for these projects. Due to the impact and interest of the community relative to these matters, she expressed the opinion that further discussion is warranted.

"Mrs. Townsend expressed her appreciation to Dr. Williams for chairing the December Board meeting in her absence due to her involvement in accomplishing a move made by her family.

"Mrs. Townsend referred to the December Board meeting and what followed in the way of newspaper articles plus telephone and personal contacts made to her. She read some excerpts from newspaper articles/letters including:

(1) a charge that voting was taken along racial lines, to which she disagreed on the basis of the makeup of the Board and that particular vote;

(2) a statement that, in spite of the addition next year of Southeast High School, Bibb County's secondary schools will remain greatly over crowded without the fifth high school, to which she agreed;

(3) a statement that the newspaper can play a significant role in overcoming past mistakes and for strong relations between and among the people of this community, to which she agreed;

(4) a statement charging that Northeast High School has more than enough space available to relieve the overcrowding Central High School even after the fourth high

school is opened, still does not deal with the issue of school size and future growth.

"Additionally, Mrs. Townsend made the following statement:

I ask you to look at the overcrowded facilities that the north Macon schools have, look at the building boom in the north Macon neighborhoods and, especially, look at the student mix coming from the proposed feeder schools that will be feeding into the proposed new high school, and, that is, Pearl Stephens and Bellevue when they are combined, Morgan, Riley, Springdale and Union. I keep hearing, and I quote, a new high school will effect more whites, unquote, and, quote, an elite high school tucked away among the affluent. Both of these statements are political statements that are being used to both propose and oppose a new high school, depending on who is making this statement. The fact of the matter is right now, right this minute, we have a healthy mix of boys and girls, both black and white, in these feeder schools that we have to take care of now. These students, as they move on up into the secondary level, need better facilities than what is available to them at this time and a smaller high school population than we have now, in order to have the best possible chance at a higher education. We need this high school for these children, for the children that we have today. For over a year now, this Board has been discussing a bond issue for funding air conditioning in all remaining schools and for building the fifth high school and middle school. Now that it has come down to the wire, somehow, Northeast High School has popped into the picture. I'm not sure who brought up that particular subject and that's really not my concern at this particular time. The fact is it's being used in a negative manner to meet a political goal and what that goal is depends on who you're talking to. The statement has been made that air conditioning was added onto the bond issue in order to approve the fifth high school while Northeast is sitting with less than the desirable 90 to 10 racial balance.

The fact is, number one, we need all these buildings air conditioned for our children; number two, the students at those elementary schools, Stephens, Bellevue, Morgan, Riley, Springdale and Union, need better facilities and that takes advance preparation and all of you who have dealt with this kind of thing knows it takes a long time to prepare for those things; and number three, Northeast High School needs some serious discussion with action following. I'm not proposing any action on Northeast tonight because that's not what this meeting was called for but I am saying that we do need some serious discussion in that area, not next year, not the following year, but now. Therefore, I would like to see this Board take some action, make some moves tonight, whatever is necessary, to resolve these problems. We could look at the statement that was made about pulling in white students and that sort of thing (but) I suggest to you that my main concern is the students that we have now. I don't see us building a high school with anticipation of getting more white students. If that happens, so be it. We may get more white or more black or whatever in any school. I see those children in those feeder schools as needing a better situation now. As I said before, you'll see those buildings overflowing with students today, this year, in the classrooms. I have one final paragraph I want to read and this, also, comes from an article. I have the man's name. I do not know him personally. The reason I'm saying this is you may recognize the paragraph. It has nothing to do with this subject. I do not know the person. I'm not agreeing or disagreeing but he makes a statement in his last paragraph that I think it is incumbent upon every Board member around this table to listen to and listen to closely because I think this is what the people of this community has placed upon us. I think this is what they expect of us. And he says:

I do not like an elected official that is partial to one section of the city or one

section of the state or to one section of our nation. To my way of thinking, they are elected to enhance and support for us the improvement of the whole.

I submit to you tonight, ladies and gentlemen of the Board, that that is what our responsibility is, is to do what this entire community needs.

With that, I've made my statement because I felt that I need to because of my absence last month.

"Mrs. Townsend invited anything more from the Board. Mr. Zimmerman, in response to board action approved in the December meeting, make a motion that the Board rescind the action of the Board taken on December 17, 1987, at which time it was resolved that the Board petition the county commissioners to call a bond referendum for March 8, 1988, to complete the air conditioning of all schools in Bibb County.

"Dr. Williams stated the motion was not in order, according to Robert's Rules of Order, unless the author of the motion is on the prevailing side. Dr. Hagler responded that the Board Attorney has ruled after reviewing Robert's Rules of Order, that a person who voted in favor of the prevailing side does not have to make the motion to rescind. Mrs. Townsend recognized the motion and Mr. Hadaway seconded the motion.

"In discussion, Mr. Lane questioned if any response has been received from the county commissioners on the petition approved, to which Dr. Hagler responded that he has talked to Mr. Emory Greene who is aware of the pending request. Mr. Zimmerman recalled again what the county commissioners perceive as advantages for not placing the school bond issue on the ballot on March 8, 1988.

"Dr. Williams requested a roll call vote.

| | |
|---|---|
| Mr. Hadaway—yes | Dr. Adams—no |
| Mr. Zimmerman—yes | Mr. Lane—yes |
| Dr. Williams—no | Mr. Massey—yes |
| Mr. Brown—no | Mrs. Townsend—yes |

Motion approved 5—3.

"Mr. Zimmerman made a motion that it be resolved that the Board of Commissioners of Bibb County are hereby requested to call a bond referendum for May 31, 1988, for the purpose of submitting a bond issue proposal not to exceed $30,000,000 for the purpose of (1) building a high school and middle school in northwest Bibb County and (2) completing the air conditioning of all remaining schools in the county. Seconded by Mr. Massey.

"Discussion followed concerning the rationale and cost involved to hold a one-item vote in May, the advantages of a May vote in order to properly inform the community, the possibility of a smaller voter turnout for a one-item vote, the fact that a late May date has previously been discussed as opposed to August, when school is out of session and many folks are on vacation, and November, when air conditioning may not seem as important as in May.

"Mr. Zimmerman requested a roll call vote.

| | |
|---|---|
| Mr. Massey—yes | Dr. Williams—no |
| Mr. Lane—yes | Mr. Zimmerman—yes |
| Dr. Adams—yes | Mr. Hadaway—yes |
| Mr. Brown—no | Mrs. Townsend—yes |

Motion approved 6—2.

"Mrs. Townsend commented on a point made earlier by Mr. Lane, when he encouraged the Board to seek out what is the real opposition to a new high school and how does it relate to Northeast, stating her opinion that it is an issue the Board needs to address and feels a work session may be in order to thoroughly review and resolve any problems.

"Dr. Williams injected and rebutted what he said was printed in the newspaper, stating that Northeast High School was not discussed in the December meeting, and he was unaware of how Northeast came to be a part of the bond issue discussion. Further, he referenced the memorandum sent out by Mr. Lane, which he agreed raised some critical issues, and he felt should be looked at in a called meeting.

"Mrs. Townsend suggested that Dr. Hagler begin with an update on the School–Within–A–School project, to which he gave an update on the task force. Mr. Bell added a meeting of the task force is scheduled for January 5, 1988, at which time two

committee reports will be given and a recommended proposal should be ready within a few weeks.

"Mrs. Townsend asked Mr. Lane to share his thoughts. He stated, as he sees things, in order to improve Northeast High School, it should be desegregated first and, as others see it, desegregation is a more gradual thing that would follow improvements in quality. It is his opinion these are the two basic points at issue to resolve.

"Dr. Adams indicated her support to the bond issue on the basis that something would be done about the conditions at Northeast and, although she sees the School–Within–A–School project as a good one, she feels it alone will not solve the problems and other workable options should be found.

"Referring to Mr. Lane's comments on desegregation, Mr. Brown raised the point of boundary lines and the need to redraw boundary lines, if you're going to desegregate a situation. He stated there has been reluctance on the part of the Board to approach that issue and, until the leadership is provided in that regard, a move on the question of desegregation will not be forthcoming. On the point of quality, he stated that specifics are necessary in a report from the Superintendent that specifies where quality is lacking at Northeast and how that is out of sync with what is being done in other schools in the system. He urged the Superintendent to bring forth at the work session some basis for a discussion on quality, not just about Northeast but the other schools as well.

"Mr. Lane offered as a possible option for consideration some type of magnet high school for Northeast, a magnet school that will appeal to a more integrated population but that is not aimed at the superior student or at the specialized student.

"It was decided to set a work session for Thursday, February 4, 1988, at 5:00 P.M.

"There being no further business, the meeting adjourned at 6:50 P.M.

/s/Judy Townsend
Judy Townsend, President

/s/Thomas E. Hagler
Thomas E. Hagler,
Superintendent"

(6) In rescinding the December 17, 1987, resolution and in discussing and passing the January 4, 1988, resolution requesting the Bibb County Board of Commissioners to submit a package bond proposal to the voters at a May 31, 1988, special election, no Board member or any other person urged the Board to request that the school bond package be submitted to the voters on Super Tuesday. Whether more or less voters—white or black—would likely turn out for the Super Tuesday presidential primary was not even discussed or considered. A date other than Super Tuesday was recommended solely because the members of the Board knew that the county commissioners, who have sole authority to call the bond election and select the election date, were opposed to a school bond referendum being added to the Super Tuesday ballot, which already included presidential primary candidates and a referendum on an additional 1% Bibb County sales tax to pay for county construction projects. The members of the Board in no way tried to or intended to manipulate the black or white vote. Their sole concern and difference among themselves was over whether there should be separate bond issue referendums for (a) air conditioning, (b) a fifth high school and middle school, and (c) a Northeast High School magnet program, or one bond issue referendum for bonds to pay for all those items. A majority of the Board favored and voted for a package bond issue because in their opinion it would benefit the entire school system and not just particular portions thereof. A minority of the Board was opposed to the concept of a fifth high school and middle school, in spite of its projected majority black enrollment. They wanted a separate referendum on the fifth high school and middle school to give them the opportunity to convince the public to disapprove of the fifth high school and middle school by voting against just the additional high school and middle school.

(7) On March 7, 1988, *the day before the Super Tuesday election*, plaintiffs' attorney wrote the president of the school

**612**

Board objecting for the first time to the Board's January 4, 1988, removal of the referendum from the Super Tuesday ballot; pointing out that the May 31, 1988, special bond referendum, in his opinion, required Section 5 preclearance; and suggesting the referendum not be held on May 31st, but instead on a higher turnout date—the August primary or November general election.

(8) On March 30, 1988, the defendants' bond attorneys submitted a request to the Attorney General of the United States for Section Five of the Voting Rights Act preclearance, pointing out that "we respectfully disagree ... that special elections constitute changes in procedures which affect voting and therefore require preclearance ... 'but' submit these materials in the interest of caution and good faith and request ... expeditious consideration...." Accompanying that request were letters from eight minority Bibb County residents—a lawyer, a doctor of medicine, a commercial photographer, the leader of "The Citizens Group," a county commissioner, a mortician and former member-president of the Board of Education, a casket company owner, and an entrepreneur—

each expressing their conclusory opinion that holding the bond election on May 31, 1988, "will not have the purpose or effect of denying or abridging the right to vote on account of race or color." That phrase comes from and was necessitated by the Voting Rights Act, 42 U.S.C. § 1973c [2]. Prior to that submission and those letters, no one having anything to do with the January 4, 1988, Board decision to request a May 31, 1988, referendum had even mentioned the question of whether or not the holding of a bond election on May 31, 1988, would have the purpose or effect of denying or abridging the right to vote on account of race or color.

(9) By letter dated April 25, 1988, a number of black residents of Bibb County wrote the Voting Rights Section of the Department of Justice contending that May 31, 1988, was chosen instead of March 8, 1988—Super Tuesday—because of an expected lower turn-out of black voters, and that the Board's decisions were racially motivated. Those letters were the first expression of such a contention.

(10) On May 25, 1988, the Civil Rights Division of the Department of Justice requested more information from the defen-

**2.** 42 U.S.C. § 1973c provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in

force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment *that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color,* or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made....
(Emphasis added).

dants, which meant it was unlikely Section 5 preclearance would be obtained before the May 31, 1988, election was held. That precipitated the filing of a complaint in this court seeking injunctive relief on account of violation of Section Five of the Voting Rights Act. A court of three judges denied injunctive relief, *Lucas v. Townsend*, 686 F.Supp. 902 (M.D.Ga.1988); upon appeal to the Supreme Court, injunctive relief was granted by Justice Kennedy, *Lucas v. Townsend*, 486 U.S. 1301, 108 S.Ct. 1763, 100 L.Ed.2d 589 (1988). As a result, the May 31, 1988, bond referendum was not held.

(11) Preceding the next meeting of the Board of Education on June 9, 1988, the Support Services Committee of the Board met, received the administration's recommendation, to wit:

PERTINENT FACTS:

On May 30, 1988, Associate Justice Anthony M. Kennedy entered an order staying the bond referendum scheduled for May 31 and enjoining the county from conducting the election. Our attorney has now advised that this action has effectively terminated both the bond referendum and the litigation since there is no way under Georgia law to reschedule a bond election once the date for holding it has passed, and the plaintiffs have obtained all of the relief they sought in the lawsuit by having the May 31 election stopped. It is now time to revisit the bond issue question and make a decision as to how the Board desires to proceed from here.

In order to re-start the process, it will be necessary to have the Board of Commissioners pass another bond resolution setting forth the date for and structure of the question to be put to the voters. It will also be incumbent upon the Board to make a good faith effort to secure preclearance from the Justice Department in accordance with the Attorney General's regulations implementing § 5 of the Voting Rights Act.

In looking at this question, the Board needs to address the timing of the election in terms of whether to schedule it in conjunction with another election date. Consideration must also be given to the question of the structure of the question put to the voters in terms of whether the Board wants to have one vote on the entire package or split the projects into two or more votes. These were the two issues raised by the objectors to the previous election, and our counsel advises that the Board must be prepared to deal with them again in the § 5 preclearance process.

There are political disadvantages to holding a bond referendum in conjunction with a regularly scheduled primary or general election. Conventional wisdom holds that it is better to have voters go to the polls for one issue rather than to vote because they are there for another purpose. Assuming that the media is supportive of the referendum, coverage should be better if there is only one issue to interpret to the public. The campaign team will have a better chance of getting the public to understand the need for bond financing if the question is not submerged in a host of other political races. Finally, the primary or general election may attract a large number of voters who are there for another election contest and who are not prepared to cast an informed vote on the school bond referendum. An example of this can be seen when constitutional amendments are voted down because voters have not been adequately informed.

On the other hand, holding the bond referendum in conjunction with a regularly scheduled primary or general election avoids the cost of having a separate election on another day. It would also eliminate one of the issues raised by the American Civil Liberties Union.

Regardless of whether the Board would rather have a special election day or combine the question with the other races on the day of a regularly scheduled election, it appears that November would be the earliest time to realistically try to hold the election. The Attorney General is supposed to make a decision on an election question submitted to him within sixty (60) days. However, he can re-

quest additional information which triggers another sixty day period. Assuming the necessary documents can be prepared and the county will pass the resolution by July 1, this would leave one hundred thirty (130) days before November 8 which is the next regularly scheduled general election. This appears to be the minimum time necessary under the circumstances.

The Board also needs to decide whether to continue with one vote for all of the projects in question, or to split the issue into two or more questions for the air conditioning of seventeen existing buildings, construction of a middle school and construction of a high school. It is the strong recommendation of the Administration that only one question be presented to the voters on the entire package. The whole point of this entire program has been to do something for the entire system and not just one part of the county or one group which happens to be for or against parts of the package. Balkanizing the issue and presenting multiple questions to the voters for each project would encourage a "ward healer" type of mentality and lead to the sure defeat of each question.

There are some voters who are going to be against any bond issue regardless of its purpose because they simply are not going to vote for a tax increase. There are those in the community who would be directly affected by the air conditioning of a particular building but who might not anticipate immediate benefit from a new high school since they live on the other side of town. Likewise, there are those who live in the western part of the county and would attend the new school who could care less about air conditioning at Central or Southwest.

In order to overcome all of this and to structure a program which has the best chance of passing and for doing something for *all* of Bibb County, the Administration believes that we should keep the package together and try to get as many persons as possible who have an interest in any part of it to support it.

The allegation has been made to the Justice Department that combining the air conditioning with the new schools has some kind of racial overtones because air conditioning "apparently is favored by the black constituency" while a new high school "is generally opposed by the black constituency." This is simply not true. The new high school is projected to have a 53% black student body based on the racial ratios in its feeder schools. Black leaders in the community have been active and outspoken in their support of the combined bond issue. Mr. William P. Randall serves as a co-chairman of the steering committee. Mr. Harris Walker has published an editorial in the Macon Courier supporting the bond issue. Many of our black principals, teachers and staff have worked long and hard for the bond issue. On the other hand, there are other persons who happen to be black, such as Mr. Brown, who opposed the fifth high school and have worked against the bond issue. However, the fact that persons in the community who are black may be divided in their views on this issue does not translate into anything "apparent" or "in general" abut the black community, and it certainly does not mean that combining this vote is an attempt to manipulate black voters.

A black family living in the Central zone might very well be concerned about seeing that Miller Middle School and the Lanier A building are air conditioned. This same family when considering its own particular interests might be less than concerned as to whether a new high school in Western Bibb County ever gets built. This is only normal and natural. Our first instincts are to be concerned about and to work for improvements in our family and our neighborhood. This is a trait, however, which transcends racial lines. The family which takes this approach could just as well be white, oriental, American Indian, Spanish surnamed or any other racial category recognized by the government.

However, we are about something here which appeals to a higher instinct, and that is the betterment of the entire com-

munity. Each part of the package is important to be sure, but the whole is greater than the parts because these improvements and others to come promise to give us an improved school system for all of our children. The best way to get these improvements passed is to appeal to the higher instinct in all of us to do something beyond our own narrow interests for the betterment of all.

RECOMMENDATION:

That the Board of Education petition the Board of Commissioners to pass a resolution calling a bond referendum for November 8, 1988, in the amount of $28,-000,000 for the combined purpose of air conditioning seventeen existing school buildings and constructing a new high school and middle school in the western part of the county.

and took the following action:

SS–5 Bond Referendum

The Committee approved a substitute recommendation which adds 2 million dollars to the requested bond issue amount to bring the total to 30 million dollars. The additional 2 million will be earmarked for capital improvements to Northeast High School associated with implementation of a magnet program. The Committee approved passing the amended recommendation to the full Board.

(12) Thereafter, the Board met for its regular June 9, 1988, meeting. The minutes of that meeting as to the bond referendum state:

Bond Referendum—Rev. Smith reported that the Superintendent had recommended in committee to petition the Board of Commissioners to pass a resolution calling for the bond referendum in the amount of twenty-eight million dollars to air condition 17 school buildings and the construction of a new high school and middle school. However, the committee is recommending that we request thirty million dollars for the above stated purpose, together with a sum of two million dollars to be used for improvement of .... the proposed magnet program. This motion was made in com-

mittee and approved by the committee with a 4 to 1 vote.

Dr. Melvyn Williams stated that he had made a request in committee for inclusion of two million dollars for Northeast. However, subsequently the Superintendent had assured Dr. Williams the proposed improvement at Northeast could be accomplished for one million dollars. Therefore, it was moved by Dr. Williams and seconded by Mr. Zimmerman that the motion be amended to include a one million dollar increase in the bond referendum. This would be twenty-nine million dollars incorporated into the motion, which includes one million dollars to be used for Northeast High School for improvements having to do with a magnet program and that the above be included in the bond referendum.

Dr. Williams further stated that the recommendation that came to the committee was that the school bond referendum be placed back on the ballot for the November 8th election for twenty-eight million dollars, but Dr. Williams being concerned about the fact that Northeast was not included thereupon offered a substitute motion for thirty million dollars and that motion was approved. Dr. Williams then moved that the report of the committee be placed on the table for discussion, which report includes the funds for air conditioning 17 remaining buildings, middle school and high school and the capital funds for the Northeast magnet program. Seconded by Mayor Robinson.

Rev. Smith stated that he wanted to vote on the motion on the floor but not vote until he had heard the feelings of this group on the separation of the issues. Rev. Smith then amended the motion to separate all four issues, that is to say there will be a twenty-nine million dollar bond referendum for air conditioning 17 buildings, middle and high school, capital money to Northeast and that the issues be divided in four sections. Seconded by Dr. Williams.

Mr. Zimmerman stated that he was going to vote against this motion in that the package has been already put together.

616

He further stressed that he could go along with one million dollars for Northeast but he is not in favor of separating the issues. He feels the Board needs to continue to pursue these matters as a whole.

Dr. Williams called for the question. The question now on the floor is for the amendment to the motion that the issues on the referendum be separated. Rev. Smith called for a roll call vote.

| | |
|---|---|
| Mr. Robinson—no | Rev. Smith—yes |
| Mr. Hadaway—no | Mr. Brown—yes |
| Mr. Zimmerman—no | Dr. Adams—yes |
| Dr. Williams—yes | Mr. Lane—no |
| Mr. Massey—no | Mrs. Townsend—no |

Amended motion defeated—6–4

Next amended motion is the twenty-nine million dollar bond referendum, air conditioning 17 buildings, middle and high school, Northeast Magnet Program, package as a whole, to change the package from thirty to twenty-nine million dollars. Dr. Williams requested a roll call vote.

| | |
|---|---|
| Mr. Massey—yes | Dr. Williams—yes |
| Mr. Lane—yes | Mr. Zimmerman—yes |
| Dr. Adams—yes | Mr. Hadaway—yes |
| Mr. Brown—no | Mr. Robinson—yes |
| Rev. Smith—no | Mrs. Townsend—yes |

Motion approved—8–2

Next motion, moved to petition the county commissioners for a twenty-nine million dollar bond referendum to air condition 17 remaining buildings, middle school, high school, capital money for the Northeast High School magnet program as a whole package. Dr. Williams requested a roll call vote.

| | |
|---|---|
| Mr. Robinson—yes | Mr. Brown—no |
| Mr. Hadaway—yes | Dr. Adams—no |
| Mr. Zimmerman—yes | Mr. Lane—yes |
| Dr. Williams—yes | Mr. Massey—yes |
| Rev. Smith—no | Mrs. Townsend—yes |

Motion approved—7–3

(Emphasis in original).

(13) The school board thus decided to petition the board of commissioners to cause a twenty-nine million dollar bond issue referendum to be submitted as a package to the voters on the November 8, 1988, general election ballot. Again, the sole issue dividing the publicly elected members of the Board was whether to submit the bond issue as a package or to split the same into three separate bond issues. The selection of November 8th as the date for the bond referendum election came from the report of the Support Services Committee. Without discussion that part of the committee report was accepted. In accepting the November 8th general election as the recommended date, the members of the Board in no way tried to manipulate the black or white vote. They simply selected the next general election.

(14) Some white citizens were for the package school bond issue and some were opposed. Some black citizens were for the package school bond issue and some were opposed. The issue was submitted to the voters as a package with the hope that the package would attract enough favorable white and black votes to cause the entire twenty-nine million dollar issue to pass for the benefit of the entire school system and all of its students.

(15) On July 27, 1988, defendants' attorneys sought Section Five preclearance of the date of the referendum—the November 8, 1988, general election—and on September 26, 1988, preclearance of the date was granted by the Attorney General. On November 8, 1988, as already stated, the voters of Bibb County, by the narrow margin of 21,915 to 21,297, approved the package bond issue. Of the 73,907 registered voters in Bibb County, 49,355 (66.7%) turned out to vote; 70.9% of white and 60.5% of black registered voters turned out. Of the 49,355 voters, 6,153 did not vote on the bond issue.

(16) The November 8, 1988, general election ballot gave all Bibb County voters the opportunity to vote for the President of the United States; Georgia Public Service Commissioners; Amendments to Georgia's Constitution; School Bonds; Enhanced 911 Service; and Sunday Alcohol Sales.

(17) Nothing prevented more Bibb County voters—black and white—from turning out for the November 8, 1988, general election or prevented each of the 49,355 who

did turn out from voting on the school bond referendum.

(18) Had the school bond referendum been held on March 8, 1988, in conjunction with the Super Tuesday presidential primary—as plaintiffs after-the-fact contend it should have been—the school bonds would have been voted upon only by the 34,978 (51.2% of the registered voters) who turned out instead of the 49,355 (66.7% of the registered voters) who turned out on November 8, 1988.

(19) From 1969 to November 8, 1988, Bibb County voters have turned out more for state and municipal general elections than for primary and special elections; the largest turnouts in almost every instance have been for presidential general elections. (Plaintiffs' Exhibit 1).

(20) In an effort to prove an actual discriminatory effect upon the plaintiffs as members of a racial minority group, plaintiffs presented the testimony of Dr. Michael Binford, an expert on electoral behavior and ecological regression. Dr. Binford analyzed approximately thirty candidate elections in which voters chose between white and black candidates, and concluded that "there is very strong evidence of racially polarized voting in all black-white contests ... and that in the candidate contests, virtually all of the variation in the vote can be explained by the racial composition of the precincts...." (Plaintiffs' Exhibit 9).

(21) Dr. Binford set forth three criteria necessary to sustain a conclusion of racially polarized voting: (a) "a strong correlation coefficient has to exist between those two characteristics," i.e., "racial composition of the electorate and the voting behavior;" (b) "a majority of white voters vote in one direction or for one candidate and a majority of black voters vote in the other direction;" and (c) "it is very difficult or, indeed, sometimes impossible for the minority population to win an election in an at-large race." (T. 54–55). A "strong correlation coefficient" according to Dr. Binford has typically required that $r = .7$. The justification for this threshold is that

when $r$ is above .7, half of the variance explained ($R^2$) is accounted for. (T. 42–43).

(22) Dr. Binford's expert conclusion that racially polarized voting has existed in black versus white candidate elections in Bibb County is supported by and based upon these criteria. The court therefore accepts Dr. Binford's expert opinion as to the existence of racially polarized voting in black versus white candidate elections.

(23) The existence of racially polarized voting in black versus white candidate elections does not prove the existence of racially polarized voting in non-candidate elections such as the subject bond referendum.

(24) Dr. Binford analyzed only two referenda elections—the 1988 sales tax issue voted down by black (71%) and white (53%) voters, and the 1988 school bond issue voted for by white (57%) and against by black (66%) voters. Dr. Binford did not analyze the seventeen other Bibb County referenda elections that took place between 1970 and 1989 and in some instances involved multiple issues. Defendants' Exhibits 28 and 29 list those referenda. Unlike black versus white candidate elections in which the white vote opposed the black vote, in nearly all referenda a plurality of black and white voters voted the same way.

(25) Drawing valid inferences and conclusions about voter behavior from statistics requires the selection of relevant elections for analysis. These candidate and referenda elections are not readily interchangeable since factors can weigh differently depending on the nature of the election. "Voting in referenda is often a more complex process than voting for candidates for office. The issues are usually more complex and policy positions of the electorate may be influenced by a variety of factors. Usually the turnout for a referendum is much lower than for a primary or general election." (Plaintiffs' Exhibit 10). In analyzing the 1988 school bond referendum, "... it is impossible to ascertain the impact of a number of additional factors, such as having school age children in a voter's family on the voting behavior of a precinct." (Plaintiffs' Exhibit 10). Thus, in drawing valid inferences and con-

clusions it is appropriate to analyze only referenda elections.

(26) While in black versus white candidate contests there was little variation in voting behavior to be explained once the racial composition of the precinct is considered, the racial makeup of the precincts typically explain little of the variation in voting on referenda. Dr. Binford's "strong correlation coefficient" which requires that $r = .7$ was reached in only 5 of the 31 referenda shown on Defendants' Exhibit 29. For the school bond referendum the correlation failed to reach .7 and only 44% of the variance in voting ($R^2$) is accounted for by race. For only four of the thirty-one listed referenda does race explain more than half of the voting variance. (Defendants' Exhibits 10 and 29). A strong correlation coefficient between the racial composition of the electorate and the voting behavior thus does not exist.

(27) An ecological regression and homogenous precinct analysis of the thirty-one Bibb County referenda shows that a majority of Bibb County white voters do not usually vote in one direction and a majority of Bibb County black voters in the other direction. (Defendants' Exhibits 28 and 29).

(28) Six hundred nineteen additional voters would have defeated the subject bond issue. Ten times that number of voters turned out but did not vote on the school bonds. 70.9% of registered white voters turned out and 60.5% of registered black voters turned out. A greater number of black voters could have turned out and/or voted in opposition to the bond issue. It was not difficult and certainly not impossible for the minority—assuming the minority was opposed—to have prevailed in the subject bond election.

(29) Racially polarized voting in Bibb County referenda elections has not been proven. Plaintiffs have therefore failed to prove any actual discriminatory effect on minority voters in Bibb County.

## CONCLUSIONS OF LAW

(30) Plaintiffs' Section Five claim having been decided adversely to them by a court of three judges and by the Supreme Court, and this court having decided plaintiffs' Section Two claim adversely to them and being unwilling to reconsider, the sole issue[3] for decision by this court is plaintiffs' claim that the defendants timed and structured the school bond referendum of November 8, 1988, with the intent of diluting minority voting strength and manipulating the minority vote in violation of the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

(31) "Claims of racially discriminatory vote dilution exist under both the fifteenth amendment and the Equal Protection Clause of the fourteenth amendment. They are essentially congruent since, under either, the claim can only be established by proof (a) that vote dilution, as a special form of discriminatory *effect,* exists and (b) that it results from a racially discriminatory *purpose* chargeable to the state." *Washington v. Finlay,* 664 F.2d 913, 919 (4th Cir.1981) (emphasis in original), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982).

■ To the extent that either the First or Thirteenth Amendments protect voting rights, that protection does not extend beyond the protection more directly afforded by the Fourteenth and Fifteenth Amendments. 664 F.2d at 927. The Thirteenth Amendment's "independent scope is limited to the eradication of the incidents or badges of slavery and does not reach other acts of discrimination." *Id.* (citing *The Civil Rights Cases,* 109 U.S. 3, 23–25, 3 S.Ct. 18, 30–32, 27 L.Ed. 835 (1883)). Although freedom of association entails the right to run for office and present one's views to the electorate, it "does not carry with it any right to be listened to, believed or supported in one's views." *Id.* at 928. Like the Thirteenth, the First Amendment

---

**3.** Super Tuesday—March 8, 1988—has come and gone. The May 31, 1988, election was stayed by Justice Kennedy for the Supreme Court. Neither this court nor any other court can order any further relief as to either election.

offers no protection of voting rights beyond those afforded under the Fourteenth and Fifteenth. *Id.*

■ (32) To make out their claim of discrimination violative of the Equal Protection Clause, plaintiffs must successfully prove that the very purpose of the challenged law, ordinance, or practice that produces the adverse effect was a discriminatory one. It is not enough to simply show that the challenged practice results in discrimination in its application and that the discriminatory consequences were foreseen at the time of its adoption. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (employment testing); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (zoning discrimination); *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (veterans preference); *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (minority vote dilution); *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (voter disenfranchisement); *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (political gerrymandering).

" 'Discriminatory purpose,' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870, 887–88 (1979) (citation omitted).

■ (33) In *Village of Arlington Heights,* the Court noted that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266, 97 S.Ct. at 564, 50 L.Ed.2d at 465. The court went on to list several nonexhaustive subjects of proper inquiry in determining whether racially discriminatory intent existed.

The first of these is whether the impact of the official action bears more heavily on one race than the other and thus provides a useful starting point. In this case the court has already found that plaintiffs have failed to show any such adverse or discriminatory effects with respect to their claim that racial polarization infects voting on referenda in Bibb County. They have not pointed to any other evidence which they contend shows any adverse impact against blacks with respect to the timing or content of the November 8th bond election. Neither have they offered evidence that any person who wanted to vote for or against the referendum was denied or inhibited in any way in casting his ballot. Therefore, the court concludes that "the impact of the official action" sheds no light on any purpose or motivation of defendants.

(34) The historical background is another source of inquiry, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 465. Defendants have operated the schools of Bibb County under the supervision of this court since 1964. The consent decree which is currently in effect was entered in 1978 after lengthy negotiations between the parties. With the exception of the question of whether to rebuild one elementary school, there has never been any allegation or contention by the parties to the desegregation case or this one that defendants have operated the Bibb County school system since 1978 in a discriminatory manner. *See Adams v. Board of Public Education,* 585 F.Supp. 215 (M.D.Ga.1984), *aff'd,* 770 F.2d 1562 (11th Cir.1985) (see file, Civil No. 1926, for complete history of this case).

(35) "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." 429 U.S. at 267, 97 S.Ct. at 564, 50 L.Ed.2d at 466. The court has carefully examined the sequence of events leading up to the decision on June 9, 1988, to propose a bond referendum on November 8th. The court finds there was no evidence of any departure from the procedural sequence normally followed in calling

for a bond election, and further finds there was no substantive departure in terms of the factors usually considered important by the decisionmaker strongly favoring a decision contrary to the one reached.

(36) Finally, the court has considered the legislative history, which according to the Court in *Arlington Heights* "may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. at 565, 50 L.Ed.2d at 466. Nothing in the testimony of defendants, the minutes and transcripts of their meetings, or the reports and recommendations of the superintendent evidences an intent to discriminate against blacks with respect to the timing or content of the bond referendum.

(37) In requesting the Bibb County Commissioners to call a bond referendum for November 8, 1988, and submit a package bond issue to the voters of Bibb County, defendants acted without any discriminatory intent or purpose.

(38) Plaintiffs' claim premised upon the Fourteenth and Fifteenth Amendments that the call for and structure of the bond referendum question were taken for the purpose and would have the result of diluting minority voting strength are DENIED.

(39) Plaintiffs' claim of vote dilution under the First and Thirteenth Amendments does not extend beyond the protection provided by the Fourteenth and Fifteenth Amendments and is therefore DENIED.

(40) Just as Congress and the state legislatures depend on coalitions, compromises, and consensus to accomplish their legislative goals, local school boards likewise depend on these legitimate legislative tools to perform their public responsibilities. A majority of the Bibb County School Board determined that a new high school, a new middle school, the air conditioning projects, and the magnet high school were necessary and important to the well being of the entire school district of which they are charged by law with the control and management. The School Board's decision to fund this comprehensive capital improvement plan through a single bond issue was

a political decision to attempt to build a consensus that would result in a majority of the voters casting an affirmative ballot in favor of doing something to benefit the entire county. That political decision in no way infringed upon any right guaranteed plaintiffs by the Constitution of the United States.

(41) The clerk of this court is DIRECTED to enter final judgment in favor of defendants and against plaintiffs on all claims asserted in this action.

SO ORDERED.